Welcome back. Thank you, Judge Owens. May it please the Court, R. D. Dienar for Plaintiff's Appellants. I would like to reserve four minutes for rebuttal. Taking the allegations in the complaint as true and drawing all reasonable inferences in favor of the plaintiffs, the children and parent plaintiffs have standing to see damages and declaratory relief. Visitation with strangers, disregard of the dignity, stability, permanency, and the best interests of the children, denial of equal protection, the imposed badge of inferiority, and added costs are all concrete, particularized injuries that are traced to the defendant's conduct and redressable by the award of the requested relief. These injuries and defendant's conduct flow from all eight of the challenged provisions in this lawsuit. Take visitation with strangers, for example. That flows directly from seven of the eight provisions that were in the plaintiff's efforts provision, the termination burden provision, and the two placement preferences provisions, and the three state law provisions that we have challenged. Now, the facts in this case are such that, for example, C.C. had to visit with hundreds, not hundreds, dozens of strangers, and he cried uncontrollably at every single one of those visits. During those visits, there are state government officials and tribal officials who told him that his mom and dad are not his mom and dad. For a two-, three-, four-year-old child, that's a traumatic injury, and that's the injury that we have claimed in this case. The same was the case with A.D., L.G., and C.R. A.D. was placed with her foster parents, now adoptive parents, at birth, and since then, she had to visit with no less than eight complete strangers. Now, in the non-Native American context, that visitation occurs only with biological parents and only with extended family members who can show that they have an existing relationship. So, counsel, let me focus you on paragraph 27 of your complaint, which to me is the strongest case you have for standing in this case. So, you were just referring to that with C.C. being in her adoptive or foster, I guess they are adoptive parents now. Right. But at the time, in a sense, having to drive to these trips and their kid being questioned a certain way, what I'm trying to understand is that what provision of the law required them to do that? Was this something the court ordered them to do? I'm sure they didn't do this voluntarily, make these trips. You mean the driving? Just the idea that they're at their home with someone that they believe to be their child, and yet they are, I'm assuming, being compelled or forced to make these trips to visit with their child. What provision of the ICWA required that to happen? The four provisions that I mentioned. It's the active efforts provision, because that says you have to conduct active efforts to have visitations that occurred in all of these cases. The second provision that that comes from is the termination burden provision, 1912F, because that provision says you have to prove that active efforts were unsuccessful before you can terminate the parental rights. And then the other two provisions that that relates to is the 15A and 15B, the adoptive preferences and the placement of foster care adoption. I don't understand why the act is requiring you to do the driving. You could do, because that seems to be a product of the size of the Navajo reservation. It's huge. If you're talking about a smaller reservation, there's no driving at all, if it's the Salt River or the Gila River or something like that. And there are ways that you could avoid travel. You have video or telephone visitations. You could try that, I suppose. Talk to the people. I don't quite understand why the act is imposing this requirement of driving hundreds of miles. It's the act plus the defendant's conduct, because it's the state government officials that required this type of visitation. So the state government gave those instructions to these foster and now adoptive parents because they were relying on the act and they were relying on the federal regulations and guidelines. And that also goes to the psychological and emotional harm that occurred in this case. And all of those are concrete, particularized injuries. If you look at cases like McCormack versus Herzog, for example, it's an abortion case in which the woman was given transactional immunity. So she was able to seek abortion under this special exception that was created for her. And in that case, the court had no trouble saying that alleging that she has to live with the stigma of having the state create an exception for her was sufficient to confer standing on her to seek a declaration and damages. The same is true here. I mean, one of the principal arguments that the other side is making is that, well, the adoptions have been finalized. But that really doesn't factor into the standing analysis at all. If you look at the racial steering cases, Smith versus City of Cleveland Heights and Halet versus Wendt Investment, the same was true there. The public works contractors argued that they were able and willing to bid on these contracts and that they were subject to this racial, race-conscious policy. And that was sufficient to confer standing because stating that is stating a concrete and particularized injury. I understand your position. It is that you don't have to show a particularized injury with respect to all of these provisions. Your position is that this is a racial-based statute, and so therefore it can be attacked without showing this particularized injury. I would push back a little bit because I would suggest that we have stated particularized injuries. And the particularized injuries are the injuries that I mentioned during the opening. Well, let me ask you this. If we agree with you that there has been a particularized injury with respect to one of these requirements, what happens then? What does the district court do? Does it have to consider the entire act even though you haven't been adversely affected by many of the provisions? Well, we would submit that we were affected by all of these provisions. In that situation where you would look at is, for example, Davis versus FEC, in which the candidate running for office was informed by the FEC that he was violating the turned around and challenged the reporting requirement and the asymmetric contribution limit requirement. And the court allowed that case to proceed because he had a personal stake in that outcome. The same is true here. The only way that these adoptions would have happened, the only way that the parental rights would have been terminated, were if these provisions would have applied. And that also goes to the mootness argument that the defendants are making. Their argument on mootness is, well, we ultimately changed our conduct in this. All three sets of defendants did that. The biggest change, for example, came from the federal defendants between the 2015 guidelines and the 2016 regulations. I'll give you two examples. One, in section C1, C2, and C3 in 2015, they said that jurisdiction transfers are available at any stage of a child foster care placement and termination of parental rights. Second example, they changed their position on considering best interests of the child. In 2015, they said you should not consider the best interest of Indian children. They are silent in the 2016 regulations. Same with the state defendants. They changed their position in AD's case after the lawsuit was filed. So the remedy that you want is to throw out the entire act? Not the entire act, Your Honor, just the five provisions. Well, those provisions that relate to the adoption. Right. And what we are saying is all of those five provisions were applicable in this case. For example, look at AD's situation. 11B was heavily contested in her case in the state court. All of these children had to undergo active efforts. All of these children's biological parental rights were terminated under 12D, excuse me, 12D and F. And all of these children were subject to the placement preferences provision. I mean, the visitation was in forbearance of the placement preferences provisions, because that's how placements occur. Some of these children did not suffer the emotional trauma that was alleged for CC, because some of them were infants. Is that right? So AD was placed at birth. That's right. And so was CR. So was any, so we have AD, LG, CR. So you take out AD and CR. We have CC that was of age 5 or 6 to no, potentially traumatic. What about LG? LG, so her case was being treated as CR's case. And she's not even an Indian child. And that's. All right. So the only one of those four children who potentially alleged trauma was CC. No, all four children are alleging that. But those that were either infants or that weren't an Indian child themselves, I don't see how they're in a position to have alleged that trauma. Well, because it's the imposition of the barrier that creates that. And that comes from race comes from public works contracting cases. And if there is any doubt. Now we're back to the, they don't have to show an actual suffering because it is de jure race-based. Well, it's that, but also there is concrete and particularized allegations. And if there is any doubt, look at the affidavits that were submitted. In this case, they are at ECF document numbers 23, 24, and 25. And also look at the partial state court record that was submitted as supplemental authority in the trial court. All of those things point to the concrete and particularized injuries here. The emotional psychological harm, the denial of equal treatment, the visitation with strangers, the added costs, both to the parents, the adoptive parents and the children. So, at this point, there isn't anything else that was needed in the complaint in terms of concreteness and particularization. Do you want to, I'm sorry, go ahead. Go ahead. I was going to say, if you want to reserve. Yes. Thank you. One second, counsel. So seven minutes. Okay, great. Thank you. May it please the court, I'm Christine Nannis representing federal defendants. I will present our case in chief in support of dismissing. Could you lower the microphone? I'll present our case in chief in support of dismissing plaintiff's claims for mootness or for lack of standing. Mr. Dre will specifically address mootness and lack of standing with respect to plaintiff's claims for nominal damages, which are only against the state. And Mr. Shaw, on behalf of Intervenor Tribes, will conclude argument in support of defendants. Defendants request that this court affirm the decision of the district court dismissing claims by plaintiff foster parents and Indian children for two reasons, either of which entirely dispenses with this case. First, because plaintiff's claims are moot and they don't have standing to seek retrospective relief. And this goes to the point that Mr. Dynar raised. We are not arguing that the adoption, that the finality of the adoptions weighs in the standing analysis as to the equal protection claims, but rather that it makes their claims moot here. Plaintiffs could have filed these constitutional claims in the state courts in front of the judges hearing the child welfare proceedings, but elected to file suit in federal court seeking relief from ICWA in those underlying proceedings. And those underlying proceedings have concluded with the successful adoption of the children by foster parents. With that, this court now has alternate grounds for dismissal because plaintiff's claims are moot. If they ever had been injured by ICWA, they are no longer because ICWA is inapplicable to them. But you, they were alleging nominal damages. And doesn't the Ninth Circuit in the Bernhardt case say that nominal damages will defeat a defense of mootness? Your Honor, I will allow further response to Mr. Dre, but as an initial matter, here plaintiffs haven't alleged any claim for actual damages, which is a distinction with Bernhardt. I don't understand what you said. Are you saying that under Bernhardt, nominal damages does not prevent mootness? You have to allege actual damages? That's what I understand that case to stand for. All right. Arizona, I was going to say, will argue that not their prayer for nominal damages doesn't save their case, and also that plaintiffs don't have standing to seek retrospective relief. Here, plaintiffs have dropped their claim for injunctive relief, but neither a declaratory judgment nor nominal damages can offer meaningful relief here because they have adopted their children. Plaintiffs can't be subject to similar proceedings again because foster parents are not under ICWA, such that the statute would apply to future proceedings regarding their parental rights. They've asserted no exception to mootness. They assert no predicate voluntary action by defendants that caused them to adopt the children for purposes of voluntary cessation. And regardless, the second prong of that analysis, it's absolutely clear that the allegedly wrongful behavior could not reasonably be expected to occur because they don't dispute that their adoptions are final. Well, you know, I just, I guess if we say it's moot, then what happens to the lower court judgment? It would be vacated, Your Honor. And so we're just going to have another lawsuit. So I don't know quite why the government wants to argue mootness so vigorously. Your original motion to dismiss was based on the contention, at least in major part, as I understand it, that the plaintiffs were basically raising a claim of racial discrimination and that the law is pretty clear that when Congress acts with respect to Indians, it's acting with respect to a political classification and that therefore there is no race-based discrimination and the complaint should be dismissed. The district court didn't take that position, but you're not withdrawing from that position, are you? No, Your Honor. I didn't understand that to be directly before the court, but we certainly still believe that it's a political classification. Well, that's my question. What is the posture of that argument? Because the law is that you can affirm on any ground in the record. That's right, Your Honor. If this court finds that that's a clear basis for dismissing the claims, they can also dismiss on the 12B6 grounds as well. But we'd have to find standing first. Yes, that's right. And in this case... But that's why... Yeah, okay. Yeah. So why don't you move from mootness to standing? Okay. Here, plaintiffs did not specifically allege that they were personally denied equal treatment from the challenge provisions of ICWA. Mr. Dienar raised several points about costs and various allegations that are not in the complaint. What about paragraph 27, though? Paragraph 27 alleges the concerns of visits with the prospective parents. The tribe's proposed placements are not fairly traceable to 1915A. 1915A is directed at state courts and requires only that if there were an extended family or tribal placement that sought to adopt the child, that it must be considered. Here, the complaint says that there were no such placements. So we understand from the Supreme Court an adoptive couple, and in the absence of a suitable and willing placement that seeks to adopt, 1915A does not apply. But here, they're alleging, look, we never would have made this visit. We never would have done any of this, but this act required us to make this visit. Why isn't that enough to at least... As an injury, why isn't that an injury? Well, in this case, we have the benefit of the Supreme Court precedent. The Supreme Court has already looked at this issue and concluded that when there is no viable alternative placement, that the section 1915A's preferences simply don't apply. And the allegations in their complaint make out those conditions. But how do you determine whether there's a viable alternative placement without the visitations? Your Honor, the question of whether there are, whether they need to determine, use placements to determine a viable placement is a question of State law. And that's also in their complaint. That's standard child welfare practice. That's responsive to my question. Okay. My question is, aren't these visitations an essential predicate to determining whether there are viable alternatives? In this case, Your Honor, they allege that the plaintiffs, the placements were not willing to adopt the children. That's also in their complaint, that none were suitable. And suitability, as I understand it, doesn't relate to visits with them. It relates to a home inspection. Are you saying these kids were required to be interviewed by people who in advance said, we don't want them? I don't know the answer to that. Sorry. I don't know why they were asked to visit with the placements. There's not details in the complaint, except that it was part of their case plan. And I think it's standard practice when there are other placements available that, to have them visit. As I understand the allegation, it is that they had to find Indian placements. And had to look at other Indian placements. And I did, and I, your brief indicates that this was a requirement of State law. But I don't, is that correct? That, well, ordinary adoption law does require that you look at family first, normally, as I understand it. But this is a little bit different, in that they had to look at Indian placements, which sent them out to the reservation. I think that's a mis, that's not quite right, in that they actually, the first preference is for family. And in this case, I think, in fact, all of the placements proposed were with family. But, to your point about the role of State law here, your Honor, the answer to your question, I believe, is in the traceability analysis. The trace, fair traceability stops when an action of an independent sovereign or party. And here, State law, that's the normal operation of State law, to visit with proposed placements. Whether they were family placements under State law, or placements proposed by parties for other reasons. Having seen that my time has concluded, if there are no further questions, thank you. Thank you, Your Honor. May it please the Court, I'm Dominic Dre. I represent the Defendant McKay. And as you heard, he's the only one facing nominal damages. So I want to spend just a couple minutes discussing how those don't change the reasons for that. The first is a general... Who is this State? Yes, ma'am. He's the Director of DCS in Arizona, Department of Children's Services. The first is a general point that we highlighted in the 28-J letter that's expressed eloquently by the 11th Circuit, explaining that nominal damages can never defeat mootness. And the second is more specific to this Court's precedent, which is the 2012 Bronstein decision that explains that where a plaintiff asserts injuries solely based on racial classification, being exposed to a system that classifies, that's inadequate for damages, nominal damages included, if the same outcome would have resulted without the classification. That's what the Supreme Court said in Texas v. Lesage, that there's no injury if the same outcome would have resulted. And that's what this Court said in Bronstein in a mootness analysis that's really on all fours with the present case. Here, to be perfectly clear, plaintiff's sole allegation of injury is that they were exposed to this type of classification. They say it at page 1 of their opening brief, and at page 33 of their opening brief, they actually say that the injury comes from their being subject to different rules on account of their race, not the consequences that flowed from that treatment. Were all the adoptions complete at the time this was filed in the district court? No. That's why it's a, yeah, it's mootness rather than standing at this point. Right. And for the State's purposes, I think that's the way that the Court could resolve this most efficiently. Aren't you just going to get sued again? We may. Keeps me employed. This is an institutional claim. The potential for future lawsuits is not a reason to keep a case alive that doesn't have an Article III case or controversy. Isn't it likely going to be moot again? I mean, then do we have the capable of repetition issue? Yeah. Because that was argued as an exception to the mootness. Maybe you are conceding that point right now. No. So what they actually argue is something more like the inherently transitory doctrine, which is a subset of capable of repetition, but evading review that pertains to class certification. And in order to meet that standard— I'm not addressing it as a class here. They filed as a class. The class cert was denied. And the other side never appealed that through 23F. And that's a litigation decision that's not something that this Court will allow to create standing when none exists. Well, but I'm still not understanding. I mean, the classic capable of repetition but avoiding review is the pregnancy situation. Now, isn't an adoption is sort of like— 2.0. It's going to happen. So the complaint is lacking in any allegations that these people intend to be involved in the adoption—excuse me—in the adoption process ever again. That would be one way that they might be able to bolster their complaint and create a cognizable interest for Article III purposes, but it's not there. And the class certification was denied, and they didn't appeal that. So the only thing that the other side is asking for—and this is very important—is they're asking for a judicial gold star saying that they were right and we were wrong about ICWA's constitutionality. And that is not a live case or controversy. It doesn't have the skin in the game that the Supreme Court has consistently required. I'm harking back. There's that paragraph. I think it's 27. But when they say they were injured by having to go through this process, that isn't—you know, you can imagine that process is itself the injury, regardless of the result. They were injured on the day that they had to have their kids go to someone else and told they're not their dad. Tell me why that's not enough. I'm happy to do that. I am past my time. But there are two pieces to it. The first is those sound a lot like actual damages, actual injuries, which are not pled, only nominal. And the second and more important thing is that in Bronstein, that would have been true in that case as well. The person who was denied a contract or in Lesage, the person who didn't get into the graduate program he wanted to attend, they were presumably subject to some amount of emotional grief along the way as well. But it wasn't sufficient to resuscitate their cases. When the only injury asserted is of the specific kind that we were exposed to a That's the Northeast Florida contractor's case. But when it's damages, when it's retrospective relief, like nominal damages and declaratory relief, that's insufficient under this court's precedent. And you just said, just raised my antenna, which I hadn't focused on, but there's no actual damages even pled here. That's correct. Yeah. I knew that, I guess, but got focused on the nominal. That's why I'm here. With that. Thank you, counsel. Shah? May it please the court, Pratik Shah on behalf of the Gila River Indian community and the Navajo Nation. I know it's been a long morning, so I'll be brief. Let me just give from the tribe's perspective what we feel is the most straightforward way to resolve this case, given that circumstances have changed and the adoptions are all complete. First, as to their forward-looking relief, it should be hopefully clear by now that that aspect of their relief is moot. All of the adoptions are complete. They're not alleging they're going to adopt again. That is gone. So the only thing left on the table then is nominal damages. And for the reasons Mr. Dre just explained, this court's decision in Braunstein is all fours. That is, when you're out of the prospective forward-looking relief box and you're in the nominal damage relief box, it's no longer good enough to disparate treatment standard. You need to show, you need to allege that the decision would have been different, the outcome would have been different. And here everyone agrees that's not alleged, that the adoptions were successful. The court doesn't have to go any further to completely dispose of this case. And just to address the capable of repetition evading exception rule, the reason that fails in this case is because this is not like pregnancy where you will never be able to raise the claim. You can raise this claim each and every time in your state court adoption proceeding. In fact, Goldwater Institute has done just that in other cases which we cite. That's what I wanted to ask. Yes. This is an institutional claim. Absolutely. They've done it. We've cited the cases on page 31 and 32 of our brief. They did it in state court. They lost. They sought cert in the Supreme Court. They lost. This is not a capable of repetition yet evading review concern. So that's the first box. That fully disposes of this case. And I think that's probably the best way to do it consistent with Article III. The other way is the way the district court did it. Of course, at the time the district court did it, the adoptions were not yet final. So it had to do that. And that's where paragraph 27 comes in, Judge Owens. Of course, you don't get to paragraph 27 under the circumstances that we're at now because under Bronstein, they have to allege that the outcome would have been different. And they don't do that in paragraph 27. Because they don't allege actual damages, my concern would be not present here. Exactly right. But even if you didn't apply Bronstein, which is controlling, obviously, in this circuit, and it's really on all fours, even if you applied Northeastern Florida under paragraph 27, the district court was right. And the reason why, Judge Owens, is you're right. That is their best, closest they come to alleging actual injury. But there's another part of standing. You have to allege the injury, but you also have to show it's fairly traceable. Not just to ICWA in the ethos, but to the specific five provisions that they allege. The only ones that are even in the ballpark are active efforts, 1912d. But the Supreme Court said in Adoptive Couple, and it's plain when you look at the text of 1912d, the placements there, the active efforts, have to be a condition to parental termination. The placements involving CC happened after parental termination. They never allege, in their complaint, that any of the alleged placements driving across the Navajo Nation reservation happened before the termination of parental rights. They do not allege that anywhere in paragraph 26 to 27. In fact, our understanding is all of those happened after that. So 1912d is not even in play. Why were they doing it? So the state court has inherent authority, in an Indian case or non-Indian case, any time anyone comes forward to ask for proposed placement, it can order on its own authority to do it. Do we know that in this record? No. They have not alleged anything to show what the basis of those were. What we do know, though, as a matter of law, just on the text of 1912d in the Supreme Court's decision in Adoptive Couple, it could not have been based on 1912d, nor could it have been based. How do we know that it was pre-termination or post-termination? Oh, because, well, one is they've never alleged that any of those placements were pre-termination. It's their burden, their complaint. And two, again, I don't want to go outside the record, but based on my understanding from the Navajo Nation, that's the case. So they haven't alleged otherwise. Now, as to 19- Was this raised below? They have an opportunity to- They had their complaint. They had an opportunity to amend their complaint. Because of these standing concerns, the judge let them amend their complaint. This is their first amended complaint. They still have not alleged that any of those visitations happened pre-termination, which is requirement 1912d. Now, the other provisions that would kick in are 1915a and b. There, it's a slam dunk under Supreme Court's decision in Adoptive Couple. Look, that was a loss for the tribes, Adoptive Couple. It cut back the application of the Indian Child Welfare Act. But because it cut it back, it is no longer in play. So for them to bring a constitutional challenge on the fact that 1915- That was the Arizona Supreme Court- That was a U.S. Supreme Court decision. And here's the quote from the U.S. Supreme Court in Adoptive Couple. This is at page 2564 of the Supreme Court's decision. It's quoted on page 29 of our brief. There is simply no preference to apply if no alternative party eligible to be preferred under 1915 has come forward. It is undisputed in this case that no party eligible under 1915 ever came forward to seek adoption or foster placement of these children. Therefore, under the very interpretation of 1915 that folks allied with the Goldwater Institute won in the Supreme Court, their entry cannot be fairly traceable to 1915. And therefore, even if you were in the universe of Northeastern Florida, which you're not because the case is moot and you only have nominal damages, they would lose even on that ground. So factually, how did these potential other parents get even identified? If they didn't come forward to ask for an adoption, how did they even get on the radar screen? Well, Your Honor, none of this is in the record. But my understanding is the tribes are able to intervene in these proceedings. The district court, the state court let them intervene. Tribal intervention. And yes, so the tribes- That's on the record probably. Yes, that is on the record. The tribes did intervene. Let's just don't say anything that's not on the record, but maybe we can make the inference you're suggesting just from the fact they're in the record. Yes. So now it's their complaint. And so, you know, I think the fair inference from their complaint is that the tribes intervene and the tribes proposed the placements. Now, it's up to the district court whether to allow those placements. What I can tell you as a matter of law, though, that the state court was not required to order those placements either out of any of the specific equal provisions they alleged. Because as I said, active efforts doesn't apply post-parental termination. C.C.'s parental rights were terminated. And they don't allege that any of the placements in paragraph 26 or 27 happened before that parental termination. And C.C. is the only one they make the argument about active efforts to in their brief. And then 1915, again, as I said before, we know as a matter of law, that was not the basis for the proposed placements. Because the Supreme Court has said 1915 is inapplicable unless someone has come forward to formally say they want to adopt the children. That never happened here. Thank you, Mr. Sheldon. Thank you, Your Honor. Let's see. Remind me what we have on the clock for rebuttal. Because I want to give him some more time. Is it 336? Let's go to six minutes. Thank you, Judge Owens. I'd like to start by addressing the mootness argument. Because I think that's easy to discard in this case. Flanagan's Enterprises, the 11th Circuit en banc decision, the court granted rehearing en banc on the merits question. And after that, the city repealed the offending ordinance. That was the type of irrevocable eradication of a prior official policy that mootness doctrine requires. And that's why the case was moot. It doesn't apply on the point that the defendant cited for, namely, the nominal damages and the declaratory relief. For those remedies, you have to look at the abortion cases. You have to look at the race-conscious admissions policy cases. You have to look at Davis v. FEC, Davis v. Guam, which is the 9th Circuit's decision, which was a panoptic challenge to the native inhabitants registration provision. Now, in that case, the government had argued, well, it's entirely speculative whether that election can ever occur. And this court had no trouble saying that that does not defeat standing. On the Brownstein argument, again, the facts in Brownstein distinguish that case and make it irrelevant for our purposes. There, the question was the past performance of the plaintiff was so bad that he could not have obtained the public works contract. That's not the situation here. The adoptive parents have shown more than adequately that they have only considered the best interests of these children. In fact, 80s parents learned the native language so that they could transfer that native culture to her. So there's overwhelming evidence that the past bad performance, as was the case in Brownstein, is simply not applicable. So that's why Brownstein really is not on all fours with this situation. The other argument that was raised is, you know, the state courts could decide all of these cases. But the simple fact of the matter is this is a federal court. We have federal questions that are presented to this court. There is no requirement that, you know, we should, it's rather odd that we would require a state court to weigh on all of these issues in the first instance when all of these questions are federal court questions. On the traceability point, we make two arguments. One, it's traceable to the eight challenged provisions, and it's traceable to the defendant's conduct. And both of those are enough to satisfy the fair traceability requirement of standing. On the declaratory judgment aspect, you know, you have to go back to Justice Holmes' decision in Nixon versus Herndon, which was the Texas ban on black voters voting in the primaries. Justice Holmes said it has not been questioned for the past 200 years that declaratory relief is available by pointing to backwards-looking injuries. That happens all the time. You know, someone trespassed on my property. Injury in the past. You know, give us a declaration, give us nominal damages that that conduct was wrong. If that argument is taken to its extreme, doesn't that just eliminate mootness altogether? Because you could always, just for anything, ask for a declaration. What you did 20 years ago to me, I want a declaration that that was illegal when you defamed me or something. I mean, I'm just a little scared about how wide that scope goes. Well, usually those questions could potentially be resolved by statute of limitations, but that's not an issue here. We had ongoing proceedings. So you're saying that the only limitation on this declaration of relief is statute of limitations? Right. I mean, that's not in the Constitution. I mean, unless something changed. There's no statute of limitations in the Constitution. So for any, you know, trespass by a government official, which would be a Fourth Amendment violation, it would be forever. That's right. And if you look at their own case, the tribe's own case, coalition of clergy, they were seeking declaratory relief and nominal damages. That was the abortion resolution that the city had passed. And of course, you know, the church is not injured in the sense that a woman is injured in that instance. But that stigma, the fact that that sends a message to the public that sours the relationship between the church and the city was enough concrete and particularization of injuries to confer standing in that situation. The same is the case here. And again, look at BABBITT, which stands for the proposition that the police changed their thought not to apply this provision. Now, the tribes came before you and admitted that the tribes could have presented an alternative adoptive placement, but that does not make this not certainly impending for standing purposes. The fact that they did not is precisely the type of change in conduct that does not render the case moot. Unless there are any further questions, I'll submit. No, thank you very much, counsel. Thank you to all the counsel in this case for outstanding argument. Very, very helpful. And the briefs as well. This matter is submitted and we are adjourned. Mr. Shaw, I am assuming you were not at the Warriors parade yesterday in Oakland. I definitely was not. He's a big Cavaliers fan, that's why. We are adjourned.
judges: Ebel, Schroeder, Owens